## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF SOUTH CAROLINA
### FLORENCE DIVISION

**CIVIL ACTION NO. 4:08-CV-3788**

**KRAFT REAL ESTATE INVESTMENTS, LLC,**
**KRAFT REAL ESTATE, LLC, AND EDWIN KRAFT**          **PLAINTIFFS**

**VS.**                    **MEMORANDUM OPINION**
                        **AND ORDER**

**HOMEAWAY.COM, INC., f/k/a WVR GROUP, INC.,**
**d/b/a CYBERRENTALS.COM, A1VACATION.COM,**
**VRBO.COM, INC., AND GREATRENTALS.COM**          **DEFENDANTS**

**BERTELSMAN, SENIOR DISTRICT JUDGE:[1]**

This case involves several claims arising from the alleged breaches of various advertising contracts. These claims primarily stem from Plaintiffs' allegation that Defendants HomeAway.com, Inc. and VRBO.com, Inc. changed the locations of their rental properties as listed in Plaintiffs' online advertisements from North Myrtle Beach to Myrtle Beach, as well as Defendants' alleged failure to send renewal notices and improperly cancelling Plaintiffs' advertisements. Plaintiffs assert that this change in location, which they contend constituted a breach of the advertising contracts, led to a decrease in rental inquiries and ultimately lost profits. Additionally, Plaintiffs allege claims of negligent misrepresentation, promissory estoppel, negligence, fraud, and a violation of the South Carolina Unfair Trade Practices Act (SCUTPA).

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 90). The Court heard oral argument on this motion on December 15, 2010, and thereafter took it

---

[1] The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

under submission.  (Doc. 137).  Having reviewed the matter further,[2] the Court now issues this

Memorandum Opinion and Order.  For the reasons that follow, Defendants' Motion for

Summary Judgment will be granted.

**FACTS**

There are three plaintiffs in this action:  Kraft Real Estate Investments, LLC ("KREI"),

Kraft Real Estate, LLC ("KRE"), and Edwin Kraft ("Kraft").  Kraft, along with several family

members, owns and operates KREI and KRE.  These companies own several rental properties,

including several beach houses in South Carolina.  Kraft primarily handles the financial aspect of

the companies, and Karen Knopff ("Knopff"), Kraft's sister, manages the daily aspects of the

South Carolina properties.  One of Knopff's responsibilities was to advertise the properties, and

she decided to list the properties on Internet vacation websites.  (*See* Doc. 121-3, Knopff Decl.,

at ¶ 3).  Knopff listed these properties on several websites, including VRBO.com ("VRBO"),

GreatRentals.com ("Great Rentals"), CyberRentals.com ("Cyber Rentals"), and

A1Vacations.com ("A1 Vacations").  (*See id.* at ¶¶ 4, 7, 10, 13).

These websites display vacation properties and allow website visitors to search for

potential rental properties.  (Doc. 121-4, Shepherd Decl., at ¶¶ 6-8).  These advertisements are

created by the property owner or lister, who inserts relevant property information into the

informational fields provided on the website, including location, description, amenities, and

rental rate.  (*Id.* at ¶ 8).  These advertisements run for either a three- or twelve-month period, as

chosen and paid for by the property owner or lister.  (*Id.*).

Great Rentals, Cyber Rentals, and A1Vacations (hereinafter collectively "the

HomeAway.com websites") are owned by Defendant Homeaway.com, Inc.  (*Id.* at ¶ 3).  VRBO

---

[2] The Court notes that many of the parties' citations to the record are incorrect in that the cited evidence either does not support the proposition for which it is cited, does not reflect the facts as represented, or are simply incomplete. Therefore, the Court has undertaken thorough review of all evidence submitted in reference to this pending motion.

is owned by Defendant VRBO.com, Inc.  (*Id.* at ¶ 4).  Both Homeaway.com, Inc. and VRBO, Inc. are wholly-owned subsidiaries of HomeAway, Inc.  (*Id.* at ¶ 5).

### A.    History of the HomeAway.com Websites

HomeAway.com acquired Great Rentals, Cyber Rentals, and A1Vacations through asset purchases in February 2005.[3]  (*Id.* at ¶ 3).  As each of these websites was previously independently owned by separate entities, their technology and overall design varied.  Upon acquisition, HomeAway.com, Inc. immediately took action to standardize the websites.

### 1.    Terms and Conditions

As one of the first steps, terms and conditions were posted on each of these websites. Carl Shepherd, Chief Operating Officer of HomeAway.com in 2005, testified that the first version of terms and conditions was posted on each website no later than March 2005.[4]  (Doc. 121-9, Shepherd Supp. Decl., at ¶ 4).  These terms and conditions were initially accessible to all visitors through a hyperlink posted on each website's homepage.   (Doc. 121-10, Shepherd Supp. Aff., at ¶ 4).

The terms and conditions placed on the HomeAway.com websites contained two sections.  The first section contained several terms and conditions purporting to apply to an individual merely visiting the website.[5]  (*See* Doc. 121-9, Shepherd Supp. Decl., Exhibit 1, at 4);

---

[3] The parties dispute whether HomeAway.com provided notice of this acquisition to the current customers of the HomeAway.com websites.

[4] Revised terms and conditions were placed on the websites throughout the time period at issue.  However, each of these versions contained materially similar provisions to those relevant to this dispute.  (*See* Doc. 121-10, Shepherd Supp. Aff., Exhibits A, B, C, and D, 2006 version); (Doc. 121-4, Shepherd Decl., Exhibits A, B, C, D, and E, 2008 version).

Although Plaintiffs argue that Shepherd's testimony as to the dates each version was posted is inconsistent, that fact is not material.  It is undisputed that after March 2005, a version of terms and conditions was posted and each version contained the provisions relevant to the dispute at hand.

[5] The introductory paragraph to the 2005 terms and conditions stated:

(*Id.*, Exhibit 2, at 10); (*Id.*, Exhibit 3, at 16).  The second section was entitled "[t]erms and conditions of advertising" on the website and contained several additional terms.  (*See id.*, Exhibit 1, at 6); (*Id.*, Exhibit 2, at 11); (*Id.*, Exhibit 3, at 17).  Particularly relevant to this dispute are those provisions addressing liability and the accuracy of posted information.

The terms and conditions cited to apply to all website visitors contained a provision entitled "Limitation of Liability."  (*See id.*, Exhibit 1, at 5); (*Id.*, Exhibit 2, at 11); (*Id.*, Exhibit 3, at 17).  This provision stated:

> IN NO EVENT WILL [WEBSITE] OR WVR GROUP, INC. BE LIABLE FOR ANY DAMAGES, INCLUDING WITHOUT LIMITATION ANY INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES ARISING OUT OF, BASED ON, OR RESULTING FROM THIS AGREEMENT OR YOUR USE OF THE SERVICE, EVEN IF [WEBSITE] OR WVR GROUP, INC. HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  THESE LIMITATIONS AND EXCLUSIONS APPLY WITHOUT REGARD TO WHETHER THE DAMAGES ARISE FROM (1) BREACH OF CONTRACT, (2) BREACH OF WARRANTY, (3) STRICT LIABILITY, (4) TORT, (5) NEGLIGENCE, OR (6) ANY OTHER CAUSE OF ACTION, TO THE EXTENT SUCH EXCLUSION AND LIMITATIONS ARE NOT PROHIBITED BY APPLICABLE LAW.  IF YOU ARE DISSATISFIED WITH THE SERVICE, YOU DO NOT AGREE WITH ANY PART OF THIS AGREEMENT OR HAVE ANY OTHER DISPUTE OR CLAIM WITH OR AGAINST LMB WITH RESPECT THIS AGREEMENT OR THE SERVICE, THEN YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USING THE SERVICE.

The section applying to advertisers also contained a provision addressing liability, stating:

> 4.1  [Website] does not warrant that the operation of the [website] will be uninterrupted or error-free.

---

We do not charge vacationers to access [website].  However, the site is only to be used to contact our advertisers regarding the suitability of their individual property as a vacation destination.  Any use by a person or entity for any purpose other than the research and subsequent booking of a vacation property is strictly prohibited.  By visiting this site, you are subject to the following terms and conditions:

(Doc. 121-9, Shepherd Supp. Decl., Exhibit 1, at 4); (*Id.*, Exhibit 2, at 10); (*Id.*, Exhibit 3, at 16).

4

> 4.2  In no event shall [website] be liable to the advertiser for any special, consequential, incidental or indirect damages, including lost profits.[6]

(*See id.*, Exhibit 1, at 7); (*Id.*, Exhibit 2, at 13); (*Id.*, Exhibit 3, at 19).

The second relevant provision, entitled "Accuracy," was listed with the terms and conditions applying to advertisers, and stated:

> 2.1 All listings on [website], as submitted by the owner/lister and amended from time to time by [website] staff, are the responsibility of the owner/lister, and [website] specifically disclaims any and all liability arising from the alleged accuracy of the listings, or any alleged breaches of contract on an advertiser's part.  By accepting these Terms and Conditions and paying to list on [website], you agree to indemnify and hold [website] and its affiliates harmless against all costs, expenses and losses arising out of a claim relating to the content of an advertisement.
>
> 2.2 Owners/listers are solely responsible for keeping their information up to date on [websites], *including, but not limited to any and all representations about the property, its amenities, location, and its availability* for a specific date or range of dates.  [Website] makes no representation or warranties that any of the copy or availability information published on [website] is accurate or up-to-date even in the case where visitors have searched for specific special offers, dates, or types of properties.

(*See id.*, Exhibit 1, at 6-7); (*Id.*, Exhibit 2, at 12); (*Id.*, Exhibit 3, at 18) (emphasis added).

## 2.    The Click-Through Process

HomeAway.com also implemented a "click-through" process on each of its websites.

This process was in place on Cyber Rentals on June 23, 2005, A1 Vacations on December 28, 2005, and Great Rentals on May 23, 2006.  (*See* Doc. 121-11, Terrell Decl., at ¶ 6).  Under this procedure, before an advertiser could list or renew a property listing, she was required to affirmatively click a box reflecting agreement to the terms and conditions posted on the website.

---

[6] The terms and conditions initially placed on Cyber Rentals in March 2005 contained an incomplete liability provision.  Section 4.2 of this version stated: "[i]n no event shall CyberRentals be liable to the advertiser for any special."  (*See id.*, Exhibit 1, at 7).  The remainder of this sentence was missing from this version.  Only this version of the terms and conditions on this website contained this incomplete provision.  (*See id.*, Exhibit 2, at 13); (*Id.*, Exhibit 3, at 19).  However, in June 2005, a revised version of terms and conditions was posted on Cyber Rentals, and this version contained the complete provision as quoted above.  (*See* Doc. 121-10, Shepherd Supp. Aff., Exhibit C, at 16).

(*See id.*).  These terms and conditions were available to the advertiser via a hyperlink located directly below the "I Agree" check box.  (*Id.* at ¶ 9).

The screen shots show that if the customer attempted to list or renew an advertisement without clicking "I Agree," a dialogue box would appear stating "[y]ou must agree to the terms and conditions."  (*Id.* at ¶ 10; *id.*, Exhibit 1, at 7).  Accordingly, once the "click-through" process was in place, an individual could not have created or renewed a listing without affirmatively clicking the "I Agree" box on each of the HomeAway.com websites.[7]  (*Id.* at ¶¶ 9-11; *id.*, Exhibits 1-3).

### 3.    Uniform Website Presentation

HomeAway.com also standardized the layouts and the features of the HomeAway.com websites, although it is unclear exactly when these changes were made.  However, an email informing advertisers that the website had been redesigned was sent prior to the implementation of the changes.  (Doc. 121-4, Shepherd Decl., at ¶ 41); (Doc. 122-2, at 13-20).  This email also encouraged the advertisers to visit the website to update their listings, confirm the accuracy of all information, and take advantage of new features.  (Doc. 121-4, Shepherd Decl., at ¶ 41); (Doc. 122-2, at 13, 15, 19).

Another email was sent after the updated websites were made public, again encouraging the advertisers to verify their listing information if they had not already done so.  The record reflects that these emails were sent to Cyber Rentals customers in June 2005, to A1 Vacations customers in January 2006, and to Great Rentals customers in May 2006.  (Doc. 122-2, at 14, 17, 18).

---

[7] Attached to Terrell's affidavit are screen shots for each of the HomeAway.com websites.  Although he testified that the screen shot depicted the process for Cyber Rentals beginning in June 2005, he did not provide the dates that the screen shots reflected for each of the other websites.  (*See* Doc. 121-11, Terrell Decl., at ¶¶ 8, 11).  However, he did testify as to the dates the process was implemented and that these screen shots reflect the processes in place on each website during the relevant period.  (*Id.* at ¶¶ 6, 7, 11).

B.    The History of VRBO

Unlike the HomeAway.com websites, the VRBO website initially contained a general disclaimer purporting to apply to any visitor to the website. (Doc. 121-12, Friesen Decl., at ¶ 3); (*Id.*, Exhibit A, at 5). This disclaimer was displayed on the website well before February 2005, although Knopff testified that she did not remember seeing it. (*Id.* at ¶ 3). This disclaimer contained a provision limiting liability to the prorated costs paid by the client for the services not provided. (*Id.*).

In November 2005, terms and conditions were posted on VRBO. (*Id.* at ¶ 4)These terms and conditions, which were modified in 2006 and again in 2007, contained provisions regarding the accuracy of the listings posted and limitation of liability provisions. Specifically, the terms and conditions stated that VRBO was not liable for "inaccuracies, errors or omissions with respect to the information." (*Id.*, Exhibit D, at 9). They further stated that users "assume the entire risk as to the accuracy, adequacy, completeness, currency, validity and quality of any information." (*Id.*). The terms and conditions also limited liability, stating that VRBO would not be "liable for any indirect, incidental, special or consequential damages resulting from the use or the inability to use the service. . . ." (*Id.* at 15).

Also in November 2005, VRBO implemented a click-through process similar to that utilized by HomeAway.com websites.[8] (*Id.*, Friesen Decl., at ¶ 4). After this process was employed, any time an existing advertiser logged in to her account, she would have to affirmatively agree to the terms and conditions before being able to administer the account in any

---

[8] VRBO provided screen shots depicting the 2007 click-through process. (*See id.*, Friesen Decl., Exhibit C). Although VRBO did not provide screen shots of the 2005 and 2006 processes, Patricia Friesen, Director of Customer Service for VRBO, testified that the process, and thus the screens that were utilized in 2005 and 2006, were materially the same as those used in 2007. (*Id.*, Friesen Decl., at ¶ 7).

way, including changing any information about the property or renewing the listing.  (*Id.*).

Creation of a new listing would also require agreement to the terms and conditions.  (*Id.* at ¶ 5).

VRBO's account software also makes a contemporaneous record when a customer

acknowledges the terms and conditions.  (*Id.* at ¶ 6).  This evidence demonstrates that an agent of

Kraft accepted the terms and conditions on December 14, 2005, December 14, 2006, and

November 16, 2007.  (*Id.*, Friesen Decl., Exhibit B, at 7).

### C.    The Listings and Subsequent Renewals

Plaintiffs' South Carolina properties were advertised on each of these websites at various

times from 2000 until 2009.  When Knopff created the listings for each of the properties on the

websites, she inserted the relevant information pertaining to each property, including the

location.  (Doc. 121-2, Knopff Aff., at ¶ 4).  She testified that she listed all properties as being

located in North Myrtle Beach.  (*Id.* at ¶ ¶ 5, 7, 9, 11).  These listings were placed using Kraft's

personal credit card, but KREI and KRE subsequently reimbursed Kraft for the listings.  (Doc.

136-1, Kraft Depo., at 39).

Knopff alleged that she initially listed properties with VRBO in March 2000, and

VRBO's business records confirm this listing date.  (Doc. 121-2, Knopff Aff., at ¶ 5); (Doc. 90-

15, Mulholland Aff., Exhibit A, at 5-11).  Knopff placed additional listings in October 2000, and

she renewed all listings regularly through 2009.[9]  (Doc. 90-15, Mulholland Aff., Exhibit A, at 6,

8, 9, 10).

Knopff averred that she first listed properties with Great Rentals on September 9, 2003,

although no other evidence corroborates this listing date.  (Doc. 121-2, Knopff Aff., at ¶ 7).

---

[9] In fact, it appears that renewals occurred in March 2001, November 2001, March 2002, November 2002, February 2003, December 2003, January 2004, November 2004, April 2005, November 2005, March 2006, December 2006, March 2007, November 2007, and March 2008.

Great Rentals's business records reflect that Knopff first listed properties with Great Rentals in January 2007.  (Doc. 122-1, Phillips Decl., at ¶¶ 7-10).  These listings were subsequently renewed in March 2007 and again in March 2008.  (*Id.*).

Similarly, Knopff alleged that she first placed advertisements with Cyber Rentals on September 26, 2003, but no other evidence shows that advertisements were placed at this time.  (Doc. 121-2, Knopff Aff., at ¶ 9).  Cyber Rentals's business records reflect that she first listed properties on this website in September 2005, which were renewed in January 2006.  (Doc. 122-1, Phillips Decl., at ¶¶ 8-11).  Knopff subsequently listed additional properties in March 2006, and all listings were renewed regularly through 2008.  (*Id.*).

Knopff testified, consistently with the business records, that she first listed properties on A1 Vacations in September 2005, and these properties were renewed in October 2006 and October 2007.  (Doc. 121-2, Knopff Aff., at ¶ 11); (Doc. 122-1, Phillips Decl., at ¶¶ 7-10).

Knopff testified that when placing these listings she did not recall any terms and conditions posted on any of the websites, nor did she remember clicking the "I Agree" box.[10] (*See* Doc. 121-2, Knopff Decl., at ¶¶ 6, 8, 10, 12); (Doc. 90-3, Knopff Depo. Excerpt, at 6).  She did, however, testify that the screen shots showing the click-through process on the HomeAway.com websites, including the "I Agree" box, looked familiar and admitted that the click-through process was in place when she renewed the listings in 2009, that she went through it, and verified the listing information.  (Doc. 90-3, Knopff Depo. Excerpt, at 5, 19).

---

[10] Although Knopff testified that she did not agree to the terms and conditions attached to Carl Shepherd's declaration when initially placing the listings, this version of the terms and conditions was not implemented until 2008.  As the listings were placed before 2008, this version of the terms and conditions would not have been in place at this time.  Furthermore, Knopff never testified that she did not agree to the other versions of the terms and conditions.

### D.     Issues with the Listings[11]

Plaintiffs allege that Knopff listed the properties in North Myrtle Beach, and at some point, the listings were changed to Myrtle Beach or completely hidden.  Plaintiffs allege that this change occurred when the individual websites were acquired by Defendants HomeAway.com, Inc. in 2005 and VRBO, Inc. in 2006.  However, they did not discover the incorrect location until 2007.

On June 6, 2007, Knopff notified HomeAway.com that although she had renewed her listings in April, not all of her properties were showing.  (Doc. 122-2, HomeAway Doc. Prod., at 4).  That same day, a customer service representative responded that she had conducted a search and all Kraft properties were showing on the websites.  (*Id.*).  When Knopff insisted that the properties were not showing, the customer service representative explained that the listings were very far down on the results list.  (*Id.* at 3).  She provided Knopff with suggestions to help her properties display higher on the list, including updating the calendar weekly, offering specials, and increasing the number of photos.  (*Id.*)

On December 24, 2007, Knopff emailed HomeAway.com again that she was not finding her properties when she conducted a search with the relevant parameters.  (Doc. 121-1, Kraft Aff., Exhibit A, at 9).  A note entered in the account history shows that Knopff was unable to find her properties because all of them except for one were listed in Mytle Beach, not North Myrtle Beach.  (Doc. 122-2, HomeAway Doc. Prod., at 2).  An entry on December 26, 2007 reflects that after confirming the appropriate location, all properties were changed to North Myrtle Beach.  (*Id.*).

Ultimately, Plaintiffs filed this lawsuit on September 30, 2008.

---

[11] Plaintiffs offered evidence as to two other problems unrelated to the claims at hand.  Therefore, these issues will not be discussed.

E.    **HomeAway.com and VRBO, Inc. Cancel Listings**

On March 31, 2009, HomeAway.com and VRBO, Inc., through counsel, notified Plaintiffs that no further renewals of their listings would be accepted and that all current advertisements would be cancelled. (Doc. 122-6, at 2). The letter further stated that full refunds for the remaining advertisement period would be issued. The letter explained that the reason for the cancellation was Plaintiffs' position that the terms and conditions did not apply to their agreements. The letter did not provide the exact date the advertisements were cancelled, but the account records note that the advertisement was cancelled and full refund issued on April 2, 2009. (*See* Doc. 90-15, at 5).

VRBO's account records contain a notation for February 2009 that the "CAN & HID" function was turned on and that the customer should not be permitted to renew the listings. (Doc. 90-15, Mulholland Aff., Exhibit A, at 5). Todd Mulholland, the Manager of Products for VRBO, testified that the term "HID" meant that the listing would simply not display to the advertiser as eligible for renewal, but otherwise did not affect the advertisement. The advertiser could still edit the listing, and it would still display to the public. (*Id.*, Mulholland Aff., at ¶¶ 3a, 5). Similarly, the term "CAN" prevented renewal notices from being sent to the advertiser but did not affect the public's ability to view the listing. (*Id.* at ¶¶ 4, 5).

### SUMMARY JUDGMENT STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure, as amended December 1, 2010, provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

Amended Rule 56(c)(1) further provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Accordingly, in response to a properly supported motion for summary judgment, a party cannot merely rely on its allegations, but must "cite[] to particular parts of materials in the record." *See id.*; *Allstate Fin. Corp. v. Financorp, Inc.*, 934 F.2d 55, 58 (4th Cir. 1991).

Under Rule 56, the moving party bears the burden of proving that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (l986). The court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party.[12] *Id.* at 587. However, testimony that an individual "does not recall" is not sufficient to create a genuine issue of material fact. *See English v. Pabst Brewing Co.*, 828 F.2d 1047, 1050 (4th Cir. 1987); *Posey v. Skyline Corp.*, 702 F.2d 102, 105-06 (7th Cir. 1983) (concluding that testimony that a plaintiff did not recall seeing a notice was not sufficient to create an issue of fact when other uncontroverted evidence established that the notice was, in fact, posted).

---

[12] Plaintiffs' response brief contains a section entitled "Facts in Dispute." The Court has thoroughly considered the alleged facts in dispute. However, some of Plaintiffs' alleged facts in dispute are either not material, not in dispute, or legal conclusions. Accordingly, the Court will not address all facts listed, but will certainly address all relevant, material facts that the parties allege to be disputed.

In reviewing a motion for summary judgment, a court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## ANALYSIS[13]

Plaintiffs assert six claims: breach of contract, negligent misrepresentation, promissory estoppel, negligence, fraud, and a violation of the SCUTPA. However, before examining each of these claims individually, the Court must analyze the applicability and enforceability of the terms and conditions. Although these terms and conditions are most relevant to Plaintiffs' breach of contract claim, the limitation of liability provision is relevant to each of Plaintiffs' claims.

**A.     Terms and Conditions**

**1.     Applicability**

The "click-through" process described above, which required Knopff to affirmatively click an "I Agree" box before listing her properties, has been termed a "clickwrap" agreement by the courts. *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 22 n. 4 (2d Cir. 2002); *Costar Realty Info., Inc., et al. v. Field*, 612 F. Supp. 2d 660, 669 (D. Md. 2009). Most courts have concluded that clickwrap agreements are valid, enforceable contracts. *See Costar Realty Info., Inc.*, 612 F. Supp. 2d at 670; *A.V. v. iParadigms, L.L.C.*, 544 F. Supp. 2d 473, 480 (E.D. Va. 2008), *rev'd in part on other grounds by A.V. ex rel. Vanderhye v. iParadigms*, *L.L.C.*, 562 F.3d 630 (4th Cir. 2009. These courts have concluded that by affirmatively clicking an "I Agree" box, a party demonstrates acceptance of these contracts in accordance with the posted terms. *See*

---

[13] Defendants argue in passing that Texas law should apply because the terms and conditions contain a choice of law provision. However, the parties do not adequately brief this issue. Because it does not appear that application of South Carolina law will result in a different substantive conclusion, the Court will not address the argument and will apply South Carolina law.

13

*Koresko v. RealNetworks, Inc*., 291 F. Supp. 2d 1157, 1162 (E.D. Cal. 2003) (concluding that clicking box on the screen marked, "I agree" on web site evinced express agreement to terms); *i.Lan Systems, Inc. v. Netscout Serv. Level Corp*., 183 F. Supp. 2d 328, 338 (D. Mass. 2002) (clicking "I agree" box is an appropriate way to form enforceable contract).

In the case at hand, undisputed evidence demonstrates that a clickwrap process was implemented on each of the websites, and that this process required Knopff to affirmatively agree to the terms and conditions in order to place and renew listings. As these listings were placed, the evidence shows that Knopff agreed to the terms and conditions.

While Plaintiffs argue that a genuine issue of material fact exists as to whether the click-through process was in place, review of Plaintiffs' cited evidence reveals that there is no such dispute. In support of their contention that the click-through process was not in place, Plaintiffs cite to certain paragraphs of Knopff's Affidavit and to the screen shots of the click-through process. (*See* Doc. 121, at 13) (citing ¶¶ 8,10,12 of Knopff's affidavit and the exhibits of the screen shots). However, these paragraphs merely state that Knopff does not recall the terms and conditions being posted on the websites and that she did not accept the 2008 version of the terms and conditions. They in no way address whether the click-through process was in place.

Furthermore, Terrell's affidavit introducing the screen shots demonstrates that this process was implemented on Cyber Rentals on June 23, 2005, A1 Vacations on December 28, 2005, Great Rentals on May 23, 2006, and on VRBO in November 2005. (*See* Doc. 121-11, Terrell Decl., at ¶ 6); (Doc. 121-12, Friesen Decl., at ¶ 4). Therefore, it is undisputed that the click-through process was in place during the relevant period, and there is no genuine issue of material fact that the process was in place on each of the websites.

Importantly, nowhere in Knopff's testimony[14] does she affirmatively testify that she did not click the "I Agree" box when listing or renewing listings.[15]  While she averred that she *did not recall* any terms and conditions being posted on any of the websites, she never testified that she did not click the "I Agree" box.[16]  This testimony is not sufficient to defeat a motion for summary judgment when undisputed evidence establishes that she necessarily would have clicked this box in order to place or renew the listings.[17]  *See Treiber & Straub, Inc. v. United Parcel Serv., Inc*., No 04-C-0069, 2005 WL 2108081, at *9 (E.D. Wisc. Aug. 31, 2005) (finding terms and conditions binding on a plaintiff when undisputed evidence demonstrated that he had to click agreement to the terms and conditions in order to ship a package using the website).  She further conceded that she would not dispute clicking the "I Agree" box if it were shown that this box had to be clicked in order for the renewal to occur.  (Doc. 90-3, Knopff Depo. Excerpt, at 6,

---

[14] Knopff provided deposition testimony, an affidavit, and a declaration in this matter.  Her affidavit is dated December 2008, her deposition was taken in November 2009, and her declaration is dated January 2010.

[15] Although Plaintiffs contend that Knopff was not required to click a box affirmatively agreeing to the terms and conditions, the cited evidence does not support this condition.  In support of this contention, they cite Knopff's affidavit and declaration, but in neither does she ever testify that she did not click the "I Agree" box.  Plaintiffs also cite Carl Shepherd's deposition, but this testimony actually directly contradicts Plaintiffs' contention.  Therefore, there is no genuine issue of material fact as to this issue.

[16] While she specifically stated that she did not agree to the terms and conditions attached to Shepherd's declaration when she initially placed the listings, (*see* Doc. 121-4, Shepherd Decl., Exhibits A-E), those terms were from 2008, and so they would not have been in place when the listings were initially placed.  Moreover, considering the undisputed evidence that she must have clicked the "I Agree" box in order to renew the listings, this testimony does not create a genuine issue of material fact regarding her assent to the other versions of the terms and conditions.

[17] Plaintiffs cite *Comb v. Paypal, Inc.,* 218 F. Supp. 2d 1165 (N.D. Cal. 2002), in support of the contention that Defendants must produce a record showing that a user agreed to the posted terms and conditions in order to demonstrate that mutual assent existed.  However, this case does not support Plaintiffs' position because the court merely recognized that the applicable statutes required production of a record that the parties entered into the agreement and the terms contained in the agreement.  *Id.* at 1172.  The statutes referenced by the court in that case are not at issue here.

Moreover, Plaintiffs' argument that the terms and conditions are unenforceable due to lack of assent because revised versions were placed on the website in 2006 and 2007 without notice to Plaintiffs fails.  As discussed above, Knopff had to agree to the terms and conditions each time she renewed a listing.  Accordingly, when she renewed listings in 2006 and 2007, she affirmatively agreed to the most current version of the terms and conditions by clicking the "I Agree" box.  Even if there was no notice that the terms had been changed, Knopff was responsible for reading the terms prior to agreeing to them.  Accordingly, Plaintiffs assented to each version of the terms and conditions.

15

8).  Therefore, there is no genuine issue of material fact that she agreed to the terms and

conditions.

As such, any listings placed after the click-through process was implemented would

constitute valid and enforceable contracts subject to the terms and conditions posted on the

website.[18]  To determine whether the terms and conditions apply to Plaintiffs' contracts, the dates

these contracts were executed must be compared with the implementation date of the click-

through process for each website.

### a.    Great Rentals

The click-through process was in place on Great Rentals in May 2006.  (Doc. 121-11,

Terrell Decl., at ¶ 6).  Knopff first listed properties with Great Rentals in January 2007.[19]  (Doc.

122-1, Phillips Decl., at ¶ 7).  Because this occurred after the implementation of the click-

through process, Knopff would have necessarily clicked the "I Agree" box, thus assenting to the

terms and conditions, when placing this listing.  Furthermore, Knopff would have had to agree to

the current terms and conditions posted on the website each time she renewed the listings.

Therefore, as Knopff agreed to them, the terms and conditions apply to all contracts with Great

Rentals.

---

[18] Plaintiffs' argument that the terms should not apply because they did not specifically explain how to reject the terms fails.  As acceptance of the terms was required to place the listing, it is a logical inference that to reject the terms, one would simply not place the listing.

[19] Although Knopff averred that she initially listed properties with Great Rentals in September 2003, no evidence demonstrates that listings were placed with Great Rentals at this time.  Moreover, Plaintiffs admit that no renewals occurred with Great Rentals during 2005 and 2006.  (Doc. 121, Plaintiffs' Response Brief, at 9).  Accordingly, even if the advertisements had been placed, they would have expired before 2005.  As Plaintiffs pinpoint February 2005 as the time the alleged misconduct began, only those contracts entered into after this date are relevant to the allegations.

### b.    Cyber Rentals

The click-through process was in place on Cyber Rentals in June 2005.  (Doc. 121-11, Terrell Decl., at ¶ 6).  Although Plaintiffs allege that Knopff initially listed properties with Cyber Rentals in September 2003, they provide no evidence that an advertisement was placed at this time other than Knopff's testimony.  Instead, the only objective evidence demonstrates that Plaintiffs did not list with Cyber Rentals until September 2005.  (Doc. 122-1, Phillips Decl., at ¶ 9).  In response to particular, objective evidence that the first listing placed with Cyber Rentals occurred in September 2005, Plaintiffs cannot rely only on their allegations but must produce evidence to support it.  *See* Fed. R. Civ. P. 56(c).  As Plaintiffs have failed to provide such evidence, the only reasonable conclusion is that the first contract with Cyber Rentals was executed in September 2005.  *See Hindman v. Greenville Hosp. Sys*., 947 F. Supp. 215, 223 (D.S.C. 1996) (concluding that a plaintiff's self-serving and uncorroborated testimony did not create a genuine issue of material fact).  *See also Kennedy v. Applause, Inc*., 90 F.3d 1477, 1480 (9th Cir. 1996) (agreeing with the district court that self-serving, inconsistent deposition testimony did not create a genuine factual dispute capable of defeating a properly supported motion for summary judgment).

Therefore, the first contract executed with Cyber Rentals occurred in September 2005.[20] As this was after the implementation of the click-through process, Knopff would have clicked the "I Agree" box and assented to the terms and conditions when placing this listing.  She also would have had to agree each time she renewed the property.  Therefore, the terms and conditions apply to all contracts made with Cyber Rentals.

---

[20] However, even if the Court accepted that the first contract was executed in September 2003 and renewed in September 2004, the effect would be that the term and conditions did not apply to the contract beginning in September 2004.  The effect of the nonapplicability of the terms and conditions will be discussed in Section B.1.

### c.     VRBO

The click-through process was implemented on VRBO in November 2005.  (Doc. 121-12, Friesen Decl., at ¶ 4).  Evidence reveals that Plaintiffs renewed their listings in December 2005 and March 2006, which would have required affirmative assent to the terms and conditions at both renewals.  Defendants also provide a contemporaneous record that Plaintiff assented to the terms in December 2005.  Therefore, from December 2005 forward, Plaintiff assented to the terms and conditions each time she renewed these listings, and all contracts after this date are subject to the terms and conditions.  Accordingly, in November 2006, at the time Plaintiffs allege VRBO's misconduct began, Knopff had already assented to the terms and conditions, and so they apply to all contracts made with VRBO.

### d.     A1 Vacations

The click-through process was implemented on A1 Vacations in December 2005.  (Doc. 121-11, Terrell Decl., at ¶ 6).  Knopff listed properties on this website on September 2005. (Doc. 122-1, Phillips Decl., at ¶ 6).  Accordingly, these contracts were executed before the click-through process was implemented.  Although the terms and conditions were posted at this time, no evidence demonstrates that she was aware of these terms and conditions or that she assented to them.  Accordingly, the contracts executed in September 2005, which expired in October 2006, are not subject to the terms and conditions.[21]

---

[21] Although the terms and conditions were posted on the website at this time, because visitors were not required to assent to them, they would constitute a "browsewrap agreement."  *See Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 937 (E.D. Va. 2010).  Most courts analyzing the enforceability of the terms and conditions of browsewrap contracts focus on whether the user had actual or constructive knowledge of the terms and conditions such that their use of the website can constitute assent to the terms.  *See id.*

In this case, the record reflects only that when initially posted, the terms and conditions were available via a hyperlink posted on the home page of the websites.  However, the record does not contain any information as to the size of the font of the hyperlink or the language used to alert the website users to the terms and conditions.  As Knopff averred that she has never read the terms and conditions, this would suggest that she did not have actual knowledge of these terms and conditions at this time.  Therefore, the Court cannot conclude that the terms and

However, when Plaintiff renewed her listings in October 2006, the click-through process was in place. Therefore, she would have had to agree to the terms and conditions before renewing. Accordingly, all contracts with A1 Vacations executed in October 2006 and thereafter are subject to the terms and conditions.

### 2.     Enforceability

As the terms and conditions apply to most of the contracts at issue, the next issue is whether the terms are enforceable.

Plaintiffs proffer several arguments that the terms and conditions are unenforceable, including that they render the contract illusory, are ambiguous, and are procedurally and substantively unconscionable.[22] The Court finds these arguments merit little discussion and, as noted at oral argument, concludes that the terms and conditions are enforceable.

Plaintiffs' argument that the terms and conditions render the contracts illusory fails. The core of the parties' contracts is that Defendants will display Plaintiffs' listings in exchange for a fee. Accordingly, each party provides consideration for this agreement. None of the provisions

---

conditions were binding on Knopff by virtue of the browsewrap agreement in place at the time the listings were initially posted on A1 Vacations.

While Defendants argue that Knopff admitted being subject to the terms and conditions posted by using the website, Defendants fail to attach the cited deposition testimony to their motion. Moreover, Knopff did not testify as the representative of the company, and so her purported admission cannot be deemed a party admission. Finally, this is a legal conclusion and, as discussed above, the record does not reflect that Plaintiffs had notice of the terms and conditions as would be legally required to establish a valid and enforceable browsewrap agreement.

[22] In Plaintiffs' response brief, they also state that the terms are unenforceable because they were induced by fraud. However, they fail to explain or develop this argument. To the extent that this argument is coterminous with Plaintiffs' claim of fraud, it will be addressed in that section of this Opinion. To the extent that this is an independent argument, the Court will not address it because Plaintiffs did not properly explain their argument. *See Hornady Transp. LLC v. McLeod Health Servs., Inc.*, 773 F. Supp. 2d 622, 625 n.2 (D.S.C. 2011) (refusing to address an argument that raised in passing in a footnote).

of the terms and conditions render the contract illusory because both sides still provided consideration supporting the agreement. [23]

Furthermore, the terms and conditions are not so ambiguous that they render the contract unenforceable. Plaintiffs contend that it is unclear to whom the terms and conditions apply, relying primarily on Carl Shepherd's deposition testimony where he stated that the terms used in the company nomenclature were somewhat confusing. However, this testimony related to the company's *internal* use of certain terms and the meanings attached to those terms, not as they are used in the terms and conditions. A cursory reading of the terms and conditions reveals that one section applies to those individuals visiting the website and the second section applies to those individuals advertising on the website. Therefore, Plaintiffs' argument that the terms and conditions are ambiguous fails.

The terms and conditions are also neither procedurally nor substantively unconscionable. The Court notes that both parties are sophisticated businesspeople who are able to understand the effect of terms and conditions. Even assuming that the provisions are more favorable to Defendants, Plaintiffs were not forced to enter in to these contracts, and there were certainly other methods of advertising available. While Defendants might have offered a service that reached more travelers, that alone does not render Plaintiff vulnerable and without options.

Moreover, the terms are typical to such contracts, and were readily available to Plaintiffs via a hyperlink located under the box where Knopff was required to agree.[24] Finally, Plaintiffs'

---

[23] Plaintiffs' cases cited in support of this argument are distinguishable, as they both address unilateral modification provisions as applied to an arbitration agreement. *See Harris v. Blockbuster, Inc.*, 622 F. Supp. 2d 396, 398-99 (N.D. Tex. 2009); *Defontes v. Dell Computers Corp.*, No. C.A. PC 03-2636, 2004 WL 253560, at *13 (R.I. Super. Jan. 29, 2004). As an arbitration provision must be supported by consideration to render the agreement to arbitrate enforceable, reserving the right to unilaterally modify the arbitration provision renders the agreement to arbitrate illusory and unenforceable. *See Defontes*, 2004 WL 253560, at *13. There is not an arbitration clause at issue in these terms and conditions, and so these cases do not support Plaintiffs' position.

objection to the limitation of liability provision fails, as such provisions have specifically been held to be enforceable under South Carolina law. *See Pride v. S. Bell Tel. & Tel. Co*., 138 S.E.2d 155, 157-58 (S.C. 1964) (holding that a limitation of liability clause was enforceable in a contract for advertising services).

Therefore, the Court finds that Plaintiffs' arguments are not meritorious and concludes that these terms apply to the contracts at issue.

### 3.    Effect of Terms and Conditions on Breach of Contract Claims

In light of the Court's conclusions regarding applicability and enforceability, the next question is the effect of these terms and conditions as to Plaintiffs' claims of breach of the relevant contracts.[25]

Plaintiffs allege that Defendants breached their contracts in the following ways:  (1) incorrectly advertising Plaintiffs' properties in Myrtle Beach; (2) failing to make the advertisements searchable with the correct criteria; (3) canceling Plaintiffs' advertisements without notice in February 2009; (4) failing to send Plaintiffs notice that their advertisements had expired; and (5) hiding Plaintiffs' advertisements from the public from February 2009 through April 2009.[26]  (Doc. 121, at 34).

---

[24] Although Plaintiffs dispute that the terms and conditions were hyperlinked to the sign up and renewal process, their cited evidence does not support this proposition.  Moreover, the screen shots reflect that the terms were available via hyperlink directly below the "I Agree" box.  (Doc. 121-11, Terrell Decl., Exhibit 1, at 6).  Therefore, there is no genuine issue of material fact as to this fact.

[25] This section addresses only those contracts the Court previous concluded were subject to the terms and conditions.  The breach of contract claim as to the September 2005 contract with A1 Vacations will addressed separately below.

[26] Plaintiffs also allege, for the first time, that Defendants breached their obligation of good faith and fair dealing by attempting to impose unfair terms and conditions.  As the Court has already concluded that the terms and conditions at issue in this case are fair and enforceable, this claim must fail.

Review of the relevant provisions in conjunction with Plaintiffs' allegations reveals that most of the alleged wrongful conduct, even if accepted as true, did not constitute a breach of the contract because the terms and conditions specifically provided that it did not.

Plaintiffs' allegation that Defendants incorrectly listed properties in Myrtle Beach is not a breach of the contracts because the accuracy provision specifically disclaims any responsibility for the accuracy of the listings.  (*See* 121-9, Shepherd Supp. Decl.., Exhibit 1, at 6-7); (*id.*, Exhibit 2, at 12); (*id.*, Exhibit 3, at 18) (stating that "[a]ll listings . . . are the responsibility of the owner/lister . . ."). Accordingly, as listing the property in the correct location was not a term of the agreement, Defendants' alleged misclassification did not constitute a breach of the contract.[27]

Furthermore, any failure as to the website's searchability does not constitute a breach. Provision 4.1 states "[Website] does not warrant that the operation of the [website] will be uninterrupted or error-free." (*See id.*, Exhibit 1, at 7); (*id.*, Exhibit 2, at 13); (*id.*, Exhibit 3, at 19). Plaintiffs' allegation regarding searchability is nothing more than a claim that the website did not function properly, and as Defendants never promised the website would run error-free, such a failure does not constitute a breach.[28]

Defendants' cancellation of the listings also does not constitute a breach. The 2008 terms and conditions, which would have applied at the time the contracts were cancelled, permit cancellation at any time if any member "is in material breach of these terms." (Doc. 121-4, Shepherd Decl., Exhibit A, at 14). By taking the position that Plaintiffs were not bound by the

---

[27] Moreover, accepting Plaintiffs' claim that the change in property location occurred immediately upon HomeAway.com's acquisition of the websites, and thus before any renewals occurred, upon Plaintiffs' first renewal, they would have renewed the listing showing that the locations were in Myrtle Beach. Therefore, after this first renewal, Defendants were merely advertising the properties in accordance with the information Knopff renewed. Therefore, this would not be a breach of the renewal.

[28] Moreover, this is the first time this argument is raised, and Plaintiffs do not explain in what way the listings were not properly searchable or provide any evidence that they were not searchable.

terms and conditions in direct contradiction to their previous agreement, Defendants were justified in terminating the listing.  Moreover, they provided Plaintiffs with notice of the cancellation and a refund.  Therefore, the cancellation was not a breach of the terms.

While Plaintiffs also allege that Great Rentals[29] failed to send renewal notices, Plaintiffs have failed to demonstrate that this is even a term of the agreement.  It is not a term contained in the terms and conditions, and Plaintiffs have provided no other evidence showing that it was otherwise made a term of the contract. [30] Therefore, Defendants alleged failure to send the notice does not constitute a breach of contract.[31]

Therefore, even accepting Plaintiffs' allegations as true, the terms and conditions demonstrate that Defendants' alleged conduct did not constitute a breach of the contracts.

However, even if Defendants' alleged conduct did constitute a breach of the contracts,[32] the limitation of liability provision expressly prohibits Plaintiffs' recovery of lost profits.  The

---

[29] While the Amended Complaint asserts this allegation against all Defendants, Kraft clarified in this deposition, and further took the position in the response brief, that this allegation applies only to Great Rentals.  (*See* 136-1, Kraft Depo., at 100).

[30] While Kraft stated that the websites contained the promise that the renewals would be sent, Plaintiffs failed to demonstrate that the websites in fact communicated this promise.  Accordingly, Kraft's unsupported testimony will not create an issue of material fact.

[31] Moreover, even assuming this were a term of the contract, Knopff averred in her declaration that she received "notices of the expiration of the Plaintiffs' advertisements from Great Rentals since September 2003" and that she renewed all listings within two weeks of receiving the renewal notices.  (Doc. 121-3, Knopff Aff., at ¶ 9).  As Knopff admits receiving notices of renewal, she concedes that no breach occurred.

[32] As to Plaintiffs' allegation that Defendants hid their advertisements, if this allegation could be established, this would appear to constitute a breach of the agreement.  However, the evidence in the record suggests that Plaintiffs' claim is based solely on a misinterpretation of terms used by VRBO.  While the account history reflects that the "HID/CAN" was activated on Plaintiffs' account in February 2009, Defendants offered uncontroverted testimony that this feature merely prevents renewal and in no way affects the public's ability to view and search the listings.  (*See* Doc. 90-15, Mulholland Aff.).

Plaintiffs cite the testimony of Patricia Friesen, wherein she stated that VRBO only deactivates listings, it does not cancel members.  (Doc. 121-8, Friesen Depo., at 41).  However, this testimony addressed the cancellation of membership provision of the terms and conditions, not what the terms HID and CAN mean within the account records.  Therefore, it does not rebut Mulholland's testimony as to the meaning of these terms and the fact that the listings are still viewable by the public.

Plaintiffs also allege that the fact that they received no rental inquiries during the applicable period demonstrates that their listings must have been hidden.  However, mere speculation cannot establish a genuine issue

relevant provision[33] states that "[i]n no event shall [website] be liable to the advertiser for any special, consequential, incidental or indirect damages, including lost profits." As Plaintiffs agreed to this term, they cannot recover any lost profits.

In summary, to the extent Plaintiffs allege breach of contract claims against Defendants for contracts with Great Rentals, Cyber Rentals, and VRBO, and A1 Vacations (specifically those contracts executed in or after October 2006), the breach of contract claims regarding incorrectly advertising Plaintiffs' properties in Myrtle Beach, failing to make the advertisements searchable with the correct criteria, and canceling Plaintiffs' advertisements without notice in February 2009 must be dismissed. Even accepting all Plaintiffs' allegations as true, the terms and conditions provide that such conduct did not constitute a breach.

Moreover, Plaintiffs' allegation that Great Rentals failed to send Plaintiffs notice that their advertisements had expired will also be dismissed because Plaintiffs failed to establish this was a term of the agreement. Even assuming that this was a term of the contract, Knopff admits receiving notice of renewals, and so she concedes that no breach occurred.

Finally, even if the alleged conduct did constitute a breach of the contract, Plaintiffs cannot recover lost profits because such damages were expressly prohibited within the terms and conditions of the contracts.

---

of material fact. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir.1992) (recognizing that a non-moving party cannot rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment).

Accordingly, Plaintiffs offer no evidence that their listings were, in fact, hidden, and thus have failed to demonstrate that the alleged breach occurred. Therefore, even though as alleged, hiding a listing would constitute a breach, Plaintiffs have failed to establish that such a breach occurred and this claim should be dismissed on the merits.

[33] Although Plaintiffs argue that the limitation of liability provision does not apply to them, this argument fails. Even accepting Plaintiffs' argument that the provision in bold applied only to visitors to the website searching for vacation rental properties, there is a separate provision contained within the terms and conditions applicable to those individuals advertising on the site. This provision also precludes recovery of lost profits.

**B.     Remaining Claims**

In this section, the Court will examine whether Defendants are entitled to summary judgment as to Plaintiff's remaining claims.  However, even if Defendants are not entitled to judgment on these claims, the limitation of liability provision discussed above would prevent Plaintiffs from recovering lost profits on any of the claims except for the claims asserted against A1 Vacations during the period of September 2005 through October 2006.

**1.     Remaining Breach of Contract Claim against A1 Vacations**

The relevant breach of contract claim against A1 Vacations is Plaintiffs' claim that their properties were incorrectly advertised in Myrtle Beach, rather than North Myrtle Beach.[34]  To recover for a breach of contract, the plaintiff must prove: (1) a binding contract between the parties; (2) a breach or unjustifiable failure to perform the contract; and (3) damage suffered by the plaintiff as a result of the breach.  *See Fuller v. E. Fire & Cas. Ins.Co.*, 124 S.E.2d 602, 610 (S.C.1962).  A plaintiff bears the burden of establishing the existence of the term allegedly breached.  *See Taylor v. Cummins Atl., Inc*., 852 F. Supp. 1279, 1286 (D.S.C.1994) (citing *Fuller*, 124 S.E.2d at 610).

The parties do not dispute that placement of the advertisements, as well as each subsequent renewal, constitutes individual contracts.  While both Plaintiffs and Defendants agree that the basic contract was that Defendants would advertise Plaintiffs' rental properties in exchange for a fee, Plaintiffs further contend that Defendants promised to advertise the properties in the correct location—North Myrtle Beach.  (Doc. 136-1, Kraft Depo., at 28, 48).

---

[34] Several of Plaintiffs' alleged breaches do not apply to the time period at issue or to A1 Vacations, specifically Plaintiffs' allegation that Defendants cancelled Plaintiffs' advertisements without notice in February 2009, Great Rentals's alleged failure to send Plaintiffs notice that their advertisements had expired, and Defendants' alleged hiding of Plaintiffs' advertisements from the public from February 2009 through April 2009.  Therefore, these claims will not be addressed.

Defendants argue that they never promised to accurately advertise the properties. Instead, their offer was merely to post the listings on their website so that visitors could view them.  The terms and conditions discussed at length above support the contention that they disclaimed any responsibility for the accuracy of the listings.[35]  Plaintiffs, therefore, have the burden to demonstrate that Defendants did, in fact, promise to correctly list the properties in North Myrtle Beach.  *See Taylor*, 852 F. Supp. 1286.

To establish the existence of this term, Plaintiffs rely only on the fact that they could choose the city of "North Myrtle Beach" rather than "Myrtle Beach" when creating their listing. (Doc. 136-1, Kraft Depo., at 48).  However, the mere fact that Plaintiffs could choose the city of the property being listed, without more, does not automatically render Defendants responsible for the accuracy of the listing.

Moreover, Plaintiffs fail to provide any evidence that A1 Vacations affirmatively promised to advertise Plaintiffs' properties in North Myrtle Beach or in any way warranted the accuracy of the listings.  In fact, Kraft, as a representative of the companies, admits that Plaintiffs cannot provide testimony wherein a company representative promised to advertise the properties in a particular manner.  (Doc. 136-1, at 34-35) (stating that Kraft could not identify an individual who represented that Defendants would advertise the properties in a certain way).

While the Court is required to draw all reasonable inferences in favor of the nonmoving party, to infer the existence of this term based on Plaintiffs' mere allegation would not be reasonable.  Accordingly, in light of Plaintiffs' complete lack of evidence that Defendants were responsible for the accuracy of the listings, Plaintiffs have failed to establish the existence of the term, and the Court cannot assume the existence of such a term.

---

[35] The Court notes that while the terms and conditions are not binding on Plaintiffs, they are relevant to Defendants' understanding of the contract's terms.

Furthermore, Plaintiffs fail to provide evidence that the alleged breach occurred. Plaintiffs rely on three facts to establish their breach of contract claim:  (1) HomeAway.com acquired A1 Vacations in 2005; (2) Kraft began to experience a decrease in rental inquiries; and (3) after the location was corrected to list the properties in North Myrtle Beach in December 2007, they experienced an increase in rental inquiries in early 2008.

However, even accepting these facts as true, they do not establish that the property locations were changed in 2005.  In fact, when asked what *evidence* Plaintiffs had to demonstrate that the properties were classified in Myrtle Beach as early as 2005, Kraft responded that "[w]e're stating this because we see that our inquiries dropped off during this time period. . . ." (Doc. 136-1, Kraft Depo., at 76).  Moreover, the only evidence in the record that actually reflects that the properties were listed incorrectly in Myrtle Beach is from December 2007.

At the summary judgment stage, Plaintiffs cannot merely rely on mere allegations to survive a motion for summary judgment.  *See* Fed. R. Civ. P. 56(c)(1).  These allegations, without evidence that the change in location actually occurred as early as 2005, do not create a genuine issue of material fact as to the element of breach.  *See Ross v. Commc'ns Satellite Corp.,* 759 F.2d 355, 364 (4th Cir. 1985) (recognizing that "[g]enuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice"), *abrogated on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

Accordingly, Plaintiffs' breach of contract claim as to the contract between Plaintiffs and A1 Vacations during September 2005 through October 2006 cannot survive summary judgment.

## 2.    Negligent Misrepresentation and Fraud Claims

Plaintiffs' negligent misrepresentation and fraud claims are premised on Defendants' alleged representation that they would advertise Plaintiffs' properties in North Myrtle Beach and

that they would send renewal notices to Plaintiffs when their advertisements expired.  (Doc. 80,

Amended Compl., at ¶ 27).  Plaintiffs also allege that after being contacted about issues with the

listings, Defendants represented that the advertisements were posted properly and working

correctly when they were not.

> To succeed in a negligent misrepresentation action, a plaintiff must prove:
>
> (1) the defendant made a false representation to the plaintiff, (2) the defendant had a pecuniary interest in making the statement, (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff, (4) the defendant breached that duty by failing to exercise due care, (5) the plaintiff justifiably relied on the representation, and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance on the representation.

*Armstrong v. Collins*, 621 S.E.2d 368, 375-76 (S.C. Ct. App. 2005) (quoting *Brown v. Stewart*,

557 S.E.2d 676, 680-81 (S.C. Ct. App. 2001)).

> In order to prove fraud, Plaintiffs must show:
>
> (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury.

*Regions Bank v. Schmauch*, 582 S.E.2d 432, 444-45 (S.C. Ct. App. 2003).

"The key difference between fraud and negligent misrepresentation is that 'fraud requires

the conveyance of a known falsity, while negligent misrepresentation is predicated upon

transmission of a negligently made false statement.'"  *Armstrong*, 621 S.E.2d at 376 (quoting

*Brown*, 557 S.E.2d at 680-81).

However, both causes of action require that the hearer had the right to rely upon the

misrepresentation or fraud.  *See id.*  South Carolina law is well settled that "[w]here there is no

confidential or fiduciary relationship, and an arm's length transaction between mature, educated

people is involved, there is no right to rely."  *Florentine Corp., Inc. v. PEDA I, Inc.*, 339 S.E.2d

112, 114 (S.C. 1985); *Poco-Grande Invs. v. C & S Family Credit, Inc.,* 391 S.E.2d 735, 736

(S.C. Ct. App. 1990).   "The principle of the right of reliance upon representations is closely

bound up with a duty on the part of the plaintiff to use some measure of protection and

precaution to safeguard his own interest." *Regions Bank*, 582 S.E.2d at 445 (citing *Thomas v.*

*Am. Workmen*, 14 S.E.2d 886, 888 (S.C. 1941)).

Defendants are entitled to summary judgment as to Plaintiffs' claims of negligent

misrepresentation and fraud.  As discussed above, Plaintiffs have proffered no evidence that

Defendants represented that they would advertise the rental properties in North Myrtle Beach or

send renewal notices.

Moreover, even assuming that these representations were made, Plaintiffs have failed to

provide any evidence that the representations were false at the time they were made.  *See Turner*

*v. Milliman*, 708 S.E.2d 766, 770 (S.C. 2011) (noting that in order to establish fraud and

negligent misrepresentations, the representation must not only be false, but false when it was

made).   Knopff testified that she entered the property locations as North Myrtle Beach.

Plaintiffs concede that the properties were correctly listed in North Myrtle Beach at least for a

period.  (Doc. 136-1, Kraft Depo., at 111).  Therefore, because the properties were correctly

listed in North Myrtle Beach initially, any alleged representation that the properties would be

listed in a particular manner at that time could not have been false.  Plaintiffs concede this very

fact.  (*See id.*) (admitting that "when the properties were correctly located, they were

representing to advertise in that location" admitting that those representations at that time were

not false).  Plaintiffs also provided no evidence that any representation that renewal notices

would be sent out was false, which they concede.  (*See id.* at 109-10) (admitting there was no

evidence that there was no evidence Defendants were lying to Plaintiffs regarding sending the

renewal notices). Therefore, Plaintiffs have provided no evidence that the alleged representations were false when made.

Furthermore, even assuming that these representations were made, and that they were false, Plaintiffs had no right to rely on them. The parties were involved in an arm's length transaction—an advertising contract.  The terms and conditions Plaintiffs agreed to when initially placing or renewing a listing expressly informed Plaintiffs that the listing accuracy was the sole responsibility of the listers.  Moreover, Defendants sent all advertisers emails at least once asking them to verify their listing information.

Therefore, even if such a representation was made, Plaintiffs had no right to rely on the representation when the terms were in direct contradiction and Defendants had requested advertisers to verify listing information.[36]  *See Florentine Corp., Inc.*, 339 S.E.2d at 114.  At minimum, Plaintiffs should have been on notice of the contradiction and taken steps to confirm the duties of each party as to the accuracy of the listing.[37] *See Regions Bank*, 582 S.E.2d at 445 (concluding that a plaintiff had no right to rely on the alleged misrepresentation when it could have been resolved by merely reading the contract).

Accordingly, Defendants are entitled to summary judgment as to Plaintiffs' negligent misrepresentation and fraud claims.

---

[36] With regard to Plaintiffs' reliance on whether the listings had been corrected, in light of the arm's length nature of the transaction, they could have easily performed a search to verify that their properties were showing.  Their reliance on Defendants' alleged representation that the problem had been fixed was unreasonable given the circumstances.  *See Regions Bank*, 582 S.E.2d at 445 (noting that "[t]he principle of the right of reliance upon representations is closely bound up with a duty on the part of the plaintiff to use some measure of protection and precaution to safeguard his own interest").

[37] It is of no consequence that Plaintiffs did not read the terms and conditions.  *See Regions Bank,* 582 S.E.2d at 440 (recognizing that a person who agrees to a contract cannot avoid the contract by claiming he did not read it).

### 3.    Promissory Estoppel

Plaintiffs' promissory estoppel claim must be dismissed for similar reasons.  A successful

claim of promissory estoppel requires a plaintiff to demonstrate:  "(1) the presence of a promise

unambiguous in its terms; (2) reasonable reliance on the promise; (3) the reliance was expected

and foreseeable; and (4) injury in reliance on the promise."  *Craft v. South Carolina Com'n for*

*Blind*, 685 S.E.2d 625, 627 (S.C. Ct. App. 2009).

Here, even assuming that Defendants did promise to advertise Plaintiffs' properties in

North Myrtle Beach, any reliance by Plaintiffs on this representation is unreasonable based on

the written terms and conditions expressly disclaiming any such promise.  *See Brewster of*

*Lynchburg, Inc. v. Dial Corp.*, 33 F.3d 355, 366 (4th Cir. 1994) (rejecting a plaintiff's

promissory estoppel argument, concluding his reliance on an oral representation that was directly

contradicted in the contract was unjustified).  Therefore, Defendants are entitled to summary

judgment on Plaintiffs' promissory estoppel claim.

### 4.    SCUTPA

To establish a claim under the SCUTPA, the plaintiff must prove:  "(1) the defendant

engaged in an unfair or deceptive act in the conduct of trade or commerce; (2) the unfair or

deceptive act affected public interest; and (3) the plaintiff suffered monetary or property loss as a

result of the defendant's unfair or deceptive act(s)."  *Wright v. Craft*, 640 S.E.2d 486, 498 (S.C.

Ct. App. 2006) (citing S.C. Code Ann. §§ 39-5-10 to -560).

To satisfy the first element, Plaintiffs contend that Defendants' failure to advertise the

properties as contracted and Defendants' alleged misrepresentations to Plaintiffs regarding the

status of their advertisements constitute unfair and deceptive acts.   However, this argument fails.

Even accepting that Defendants incorrectly advertised Plaintiffs' properties in Myrtle Beach, this

action is not deceptive or unfair in light of the accuracy provision contained in the terms and conditions, which the Court has already concluded apply to the contracts at issue.  Because Defendants expressly stated that advertisers were responsible for the information displayed within the listings, they had no responsibility to ensure that the property descriptions were accurate.  Therefore, even assuming that the properties were listed incorrectly, the fact that Defendants continued to display the advertisement is neither deceptive nor unfair.[38]

　　　　To the extent that Plaintiffs suggest that Defendants acted deceptively in stating that her locations had been corrected when they had not been, this contention fails.  The account history reflects that the locations were changed on December 26, 2007, and Plaintiffs offer no proof that these listings were not fixed at this time.[39]  Moreover, evidence suggests that Defendants were responsive to Knopff's complaints, immediately responding and correct the locations within days.  Therefore, in light of the uncontroverted evidence that the problem was resolved in December 2007, Plaintiffs' allegation that Defendants' misrepresented the status of their accounts fails.[40]

---

[38] Plaintiffs also argue for the first time in their response brief that terminating their listings without notice also constitutes an unfair or deceptive act in violation of SCUTPA because this cancellation occurred in their busiest month.  (Doc. 121, at 35).  This argument fails because Plaintiffs received notice of the cancellation via a letter to counsel and the cancellation was permitted by the terms and conditions.  As such, this action was neither deceptive nor unfair.

[39] While Plaintiffs contend that the locations were not corrected until April 2008, they merely cite to Kraft's Affidavit in support of this contention.  The account history reveals that the properties were in fact correct in December 2007.  Accordingly, Kraft's unsupported testimony does not create a genuine issue of fact.  Moreover, even if it did, the exact date of the correction is not material.

[40] Plaintiffs argue for the first time that Defendants Terms and Conditions violate the SCUTPA, presumably due to the inclusion of the limitation of liability clause.  In support of this argument, they rely on *Simpson v. MSA of Myrtle Beach, Inc.*, 644 S.E.2d 663 (S.C. 2007), citing it for the proposition that "a limitation of liability provision that eliminates statutorily required damages violates the UTPA."  (Doc. 121, at 35).  However, this case does not support Plaintiffs argument, as it addresses the unconscionability of an arbitration clause where the clause prohibited an arbitrator from awarding punitive, double, or treble damages.  *See Simpson*, 644 S.E.2d at 670-71.  That court concluded that this limitation was oppressive and one-sided, ultimately finding the arbitration clause unconscionable.  *See id.* at 671.
　　　　Moreover, the plaintiff in that case was relatively unsophisticated and unable to understand the implications of the arbitration clause.  In the instant case, Plaintiffs are sophisticated businesspeople who are certainly able to

Even if the Court were to accept that these actions constituted a deceptive or unfair act, Plaintiffs have failed to establish that these acts affect the public. While "[a]n impact on the public interest may be shown if the acts or practices have the potential for repetition," *see Singleton v. Stokes Motors, Inc.*, 595 S.E.2d 461, 466 (S.C. 2004) (citing *Crary v. Djebelli*, 496 S.E.2d 21, 23 (S.C. 1998)), the general rule is that a breach of a contract, without more, is not actionable under the UTPA. *See Omni Outdoor Adver., Inc. v. Columbia Outdoor Adver., Inc.*, 974 F.2d 502, 507 (4th Cir. 1992) (citing *Key Co., Inc. v. Fameco Distribs., Inc.*, 357 S.E.2d 476, 478 (S.C. Ct. App. 1987)).

Although Plaintiffs contend that Defendants' acts are capable of repetition, Plaintiffs have provided no evidence that Defendants have listed other properties incorrectly.[41] Thus, Plaintiffs offer nothing more than speculation that Defendants' actions have occurred before and have impacted the public. *See Omni Outdoor Adver.*, 974 F.2d at 507 (noting that "South Carolina courts have consistent rejected speculative claims of adverse public impact and required evidentiary proof of such effects").

Moreover, even the fact that Defendants could incorrectly list other properties does not automatically establish an impact on the public. The fact that Defendants could list other properties in the wrong location does not impact the rights of the public generally. In such situations, only the rights of the party with whom Defendants contracted would be affected. Thus, as defined, and even accepting the potential for repetition, Plaintiffs' allegations do not

---

understand the limitation of liability provision. The Court acknowledges that parties are permitted to contract away their rights, and as already discussed, the Court has found no cause to second guess the terms of an otherwise valid agreement.

[41] In support of this assertion, Plaintiffs do not cite to any evidence contained in the record. They merely state that based on the procedures used in this case, "it is highly likely that the Defendants have listed other customers' properties incorrectly." (Doc. 121, at 37). However, this is mere speculation, which will not support a claim under SCUTPA. To the extent that Plaintiffs rely on the exhibit of customer complaints, (*see* Doc. 122-8), and assuming their relevance, these complaints constitute hearsay and thus cannot support Plaintiffs' SCUTPA claim.

involve practices that directly or indirectly affect the rights of anyone except the contracting parties. *See Key Co., Inc*., 357 S.E.2d at 478. As such, Defendants alleged misconduct does not impact the public. Accordingly, Defendants are entitled to summary judgment as to this claim.[42]

### 5.     Negligence

The elements of negligence are: (1) duty, (2) breach of that duty, (3) proximate causation, and (4) injury. *See Troutman v. Facetglas, Inc.*, 316 S.E.2d 424, 426 (S.C. Ct. App. 1984). It is well-settled that if the alleged tort arises out of a contract, an independent relationship must exist, irrespective of the contract, that would give rise to a duty. *See Meddin v. S. Ry.-Carolina Div.*, 62 S.E.2d 109, 112 (S.C. 1950); *Felder v. Great Am. Ins. Co*., 260 F. Supp. 575, 578-79 (D.S.C. 1966). The existence of a duty is a question of law for the court. *See Spence v. Wingate*, 716 S.E.2d 920, 926 (S.C. 2011).

Plaintiffs allege in their Amended Complaint that Defendants had a duty to advertise their properties with care. However, they cite no case law for this proposition, and the Court has found no case imposing a duty to advertise with care as between two entities engaged in an advertising contract. Thus, the only duty Defendants owed to Plaintiff arose from the contract, and this will not support a cause of action for negligence. *See Meddin*, 62 S.E.2d at 112.

Furthermore, Plaintiffs' argument that the parties had a "special relationship" based on membership to the websites that would give rise to an independent duty fails. Mere membership to a website, without evidence establishing a relationship of trust or confidence between the parties, does not create a special relationship establishing an independent duty on one of the

---

[42] Having reached this conclusion, the Court will not address Defendants' argument regarding whether negligence can support a claim under SCUTPA.

contracting parties.[43]   Therefore, as Plaintiffs cannot establish the element of duty, Defendants

are entitled to summary judgment on this claim.[44]

## CONCLUSION

Therefore, having heard the parties, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 90) be, and is

hereby, **GRANTED**. A separate judgment shall enter concurrently herewith.  **IT IS FURTHER**

**ORDERED** that Defendants' Motion to Strike (Doc. 126) be, and is hereby, **DENIED**.


This 24th day of January, 2012.



Signed By:
_William O. Bertelsman_
United States District Judge

---

[43] Moreover, Plaintiffs' cited cases are distinguishable, as they relate to situations involving a individuals who owe their clients a recognized independent duty, i.e. lawyers, engineers, and builders.

[44] Having reached this conclusion, the Court will not address the parties' economic loss arguments.